IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

WOMEN'S PROFESSIONAL RODEO ASSOCIATION, INC.

     Plaintiff,

v.

PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC.

     Defendant.

## COMPLAINT

Plaintiff Women's Professional Rodeo Association, Inc. ("WPRA"), by and through its attorneys, hereby states as its Complaint against the Professional Rodeo Cowboys Association, Inc. ("PRCA") as follows:

### JURISDICTION and VENUE

1.     This Complaint is filed and these proceedings are instituted under the provisions of 15 U.S.C. §§ 15, 22 and 26, commonly known respectively as §§ 4, 12 and 16 of the Clayton Act. This Court also has jurisdiction under 28 U.S.C. § 1337. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

2.     This cause of action arises under 15 U.S.C. §§ 1 and 2, commonly known as §§ 1 and 2 of the Sherman Act.

3.      Venue as to Defendant PRCA lies in this judicial district pursuant to the provisions of 15 U.S.C. § 22, commonly known as § 12 of the Clayton Act, and 28 U.S.C. §1391(b) and (c).  Defendant maintains its principal office and transacts business and is found within the jurisdiction of Colorado.

4.      The interstate commerce described herein is carried on in part into, within and from the District of Colorado.  Many of the illegal acts set forth in this Complaint have been wholly or partially performed within the District of Colorado.   The acts complained of herein were within the flow of interstate trade and commerce and had a direct and substantial impact on that trade and commerce.

## PLAINTIFF

5.      The WPRA is the oldest independent women's professional sports organization in the country.  It was founded in 1948 in San Angelos, Texas by a group of 38 women.  The primary purpose of the original Girls Rodeo Association (later renamed "Women's Professional Rodeo Association") was to give women legitimate opportunities to compete in rodeo events. Members of the WPRA, by its bylaws, are exclusively women.

6.      The WPRA is and has been a Colorado nonprofit corporation with an address of 1235 Lake Plaza Drive, Suite 127, Colorado Springs, Colorado  80906.  For a period of time, its principal office moved to Oklahoma City, but in 1995, it returned to Colorado Springs.  The WPRA employs five people in its Colorado Springs office.

7.      The WPRA is a self-sustaining operation.   The WPRA is responsible for all administrative and overhead costs of its operation, including facility, salary, lease, professional

and other fees related to corporate administration.  It maintains its own rulebook which governs the operation of the Association, the structure of its Board of Directors, competition rules, and disciplinary requirements for rule violation, among other things.  The WPRA is a nonprofit organization and does not have a for-profit subsidiary or other entities which allow it to retain profits.

8.    The WPRA sanctions barrel races at more than 600 rodeos throughout the country, with total payoffs of more than $5 million.  Presently, the WPRA has more than 2,000 members.  Although a small portion of WPRA members (less than 100) participate in certain roping events and rough stock events, the large majority (over 95%) of WPRA members participate only in barrel racing.  Barrel racing is described further below.

## DEFENDANT

9.    Defendant PRCA is a nonprofit corporation organized and existing under the laws of the State of Colorado, with an address of 101 Pro Rodeo Drive, Colorado Springs, Colorado 80919.  Its principal place of business is in Colorado Springs.  PRCA is involved in all phases of professional rodeo in the United States and other areas.  PRCA rodeo events consist of calf (tie-down) roping, steer wrestling, team roping (heading and heeling, referred to collectively as "team roping" herein), saddle bronc riding, bareback riding and bull riding, in general.

10.    The PRCA has the dominant share of the professional rodeo market. In 2005, the PRCA had approximately 7,000 members and sanctioned over 650 rodeos with annual prize money exceeding $36 million.  PRCA members are cowboys, stock contractors, secretaries, timekeepers, rodeo clowns, bullfighters, laborers, judges, arena photographers, and specialty

acts.  The PRCA, like the WPRA, is a rodeo-sanctioning body.  Local rodeo producers (known as rodeo committees) which desire to hold a PRCA-sanctioned rodeo must apply to the PRCA for approval and must abide by PRCA rules when sanctioned.

11.     The PRCA controls access to the following premier professional rodeo events: the Wrangler National Finals Rodeo, the Dodge National Circuit Finals, the rodeo Circuit Finals, and the Wrangler Pro Rodeo Tour.

12.     Like the WPRA, the PRCA is self-sustaining in terms of payment for facility, salary, administration, professional and other overhead costs.  Unlike the WPRA, however, the PRCA has other subsidiary corporate entities, in particular, PRCA Properties.  PRCA Properties is a for-profit subsidiary corporation which allows the PRCA to retain profits earned from merchandise sales, intellectual property licensing, advertising, television and other similar profitable enterprises.

### HOW RODEO WORKS

13.     **Rodeo Committees.**  Rodeo committees are the backbone of the rodeo industry. These groups, often comprised entirely of volunteers, produce the individual regular season rodeos throughout the year in communities across America.  Rodeo committees raise "added money" – the money which is added to competitor entrance fees to create the prize money needed to entice rodeo cowboys and cowgirls to come to that rodeo committee's rodeo.

14.     To ensure a quality product and fan attendance, rodeo committees frequently seek the sanction of professional organizations such as the WPRA and the PRCA.  Although not required to do so, between 600 and 800 rodeo committees annually seek sanction for the six

PRCA events (described above) and WPRA sanction for barrel racing.  Both the PRCA and WPRA independently negotiate contracts, known as approvals, with the rodeo committees.  Pursuant to these approvals, the rodeo committee pays a certain amount of money to the sanctioning body and agrees to follow the rules of that sanctioning body at its rodeo.  This ensures that the best possible competitors attend and that a professional event is held.  It maintains the quality and integrity of the Associations and the sport.  If rodeo committees decide to put on a rodeo without PRCA or WPRA sanction, that rodeo is known as an "amateur" or "open" rodeo.

15.  **Barrel Racing.**  Barrel racing is the primary WPRA event, and the event the WPRA sanctions in connection with PRCA-sanctioned rodeos.  Barrel racing is, in essence, a western horse race.  In a rodeo arena, a horse and rider attempt to circle three barrels arranged in a clover-leaf pattern.  The horse and rider generally enter and exit the arena at the same point, and the fastest time wins.  This sport has gained much popularity over the years due to the beauty, grace and strength of both horse and rider, necessary to maneuver the barrel pattern.

16.  **Cards vs. Permits.**  Both the WPRA and PRCA members are divided between cardholders and permit holders.  In general, cardholders have full membership privileges within the Association, including voting privileges.  The cost of a WPRA card in 2006 is $300.00, and a PRCA card is $500.00.  Permits are available to those who are entry level in the professional rodeo membership ranks.  Permit holders privileges, however, are less than cardholders.  Permit holders who win $1,000.00 are then eligible to purchase cards, if they so choose.  In 2006, the cost of a WPRA permit is $250.00, and a PRCA permit is $300.00.

## HISTORY OF THE WPRA and PRCA

### Background

17.     When the WPRA was founded in 1948, it sought an alliance with the existing PRCA body, then known as the Rodeo Cowboys Association ("RCA").  The WPRA founders sought this alliance such that women's events could be held in conjunction with RCA-sanctioned rodeos.  At that time, RCA rodeos primarily limited women to sponsor and queen contests, deeming it unladylike for women to participate in true competition.  After negotiating with rodeo committees around the country, those committees asked that the WPRA competitors compete in the barrel race.  Thus, although the WPRA was founded based on competition in numerous rodeo disciplines, the barrel race thereafter became the driving force of the Association.

18.     In 1959, the PRCA began holding a National Finals Rodeo ("NFR") at the end of each year to determine its annual champions.  In 1967, the WPRA began to participate at the NFR.  Over the past 40 years, the WPRA has developed and refined barrel racing at the NFR. Each year, the top 15 WPRA barrel racers (based on total money won during the year), along with the top 15 PRCA cowboys in each event, compete at the NFR.  Because of WPRA efforts, barrel racing has become increasingly popular at the NFR (now called The Wrangler National Finals Rodeo), and ranks as the second most popular event.

19.     The NFR was held in Oklahoma City until 1985, when it moved to Las Vegas, Nevada.  The NFR has grown to become the PRCA's premier event and generates revenue to the PRCA annually.  At no time, however, has the WPRA ever participated in any net revenue derived from the NFR, even though the WPRA has allowed the PRCA to market its professional women's image to sell sponsorships for the NFR and other rodeos.

6

20.     The PRCA and WPRA have also created 12 different geographic "circuits" around the country.  Circuits were created for professional rodeo cowboys and cowgirls who chose to participate in rodeos closer to home in their region.  For example, the Mountain States Circuit consists of Wyoming and Colorado, Texas is its own circuit, and so on.  Each year the top twelve or fifteen qualifiers in each circuit in the six PRCA events and the WPRA barrel racing event are invited to a "Circuit Finals" held each year in each circuit.  The champions of each circuit are then invited to Pocatello, Idaho to participate in the Dodge National Circuit Finals where national circuit champions are crowned.

21.     A few years ago, the PRCA instituted the Wrangler ProRodeo Tour.  The Tour is divided into approximately 12 winter Tour rodeos with a winter finals in June, approximately 12 summer Tour rodeos with a summer finals in September, and a "Championship Finale" in November.  Each of the regular season Tour rodeos features one of the top rodeos in the country and contestants earn Tour points based on their performance at each Tour rodeo stop.  Each contestant then selects 10 of the 12 rodeos he or she wishes points to count toward the series total and at the end of the winter and summer series, the top 12 in each event then advance to the appropriate championship series.

22.     The WPRA sanctions the barrel races at the Tour rodeos just as it does at other regular season rodeos.  On information and belief, prior to 2006 prize money at the Tour finals has resulted from sponsor dollars.  The WPRA has allowed the PRCA to market its professional women's rodeo image to obtain sponsors.

23.     On information and belief, in late 2005, the Tour finales (winter finals, summer finals, and Championship Finale) and certain other rights were sold to Pro Rodeo Tour, LLC.

On information and belief, this entity, in exchange for the license to promote and broadcast these rodeos and retain profits thereto, paid the PRCA up-front money and pays the PRCA approximately $500,000.00 annually.   On information and belief, the rights to these rodeos included the barrel race, despite the fact the WPRA was not consulted with respect to this sale, and does not receive any money from the sale.

## Alignment of WPRA and PRCA

24.     Through the years, the WPRA has voluntarily aligned itself with the PRCA and honored PRCA requests that it follow the PRCA's lead on certain issues.   Examples of this alignment follow:

- When the PRCA raised its minimum membership age limit from 14 to 18 several years ago, the WPRA followed suit.

- When the PRCA requested the WPRA honor and not obtain its own sponsors in competition with PRCA national sponsors, the WPRA agreed.

- However, when the PRCA asked the WPRA to obtain sponsors for special events (Olympics, etc.), the WPRA has done so.

- When the PRCA asked that the WPRA not count "points" (each dollar won by a contestant is a point) won in rodeos not also sanctioned by the PRCA for NFR and circuit qualification, the WPRA agreed.

- The WPRA has followed the PRCA rules and regulations regarding the Circuit Finals rodeos and NFR at those events.

▪ The WPRA move of its national office from Oklahoma City to Colorado Springs in 1995 was precipitated, in part, in response to the PRCA's belief that the WPRA headquarters should be closer to the PRCA headquarters in order to facilitate the ongoing working relationship.

25.     In addition to the above, the WPRA has agreed to use the PRCA's PROCOM computer entry system.  This is a computer program by which rodeo contestants (PRCA and WPRA) are allowed to remotely enter rodeos.  Contestants call PROCOM (located at the PRCA headquarters) and give their identification numbers and then will be entered into rodeos. Contestants for both Associations pay a fee for this service.  The WPRA pays substantially more, however.  In 2005, the fee purely for PROCOM usage was $5.00 per event for PRCA members and $13.00 for WPRA members.  In 2006, the per-entry PROCOM fee for WPRA members increased to $15.00, but remained $5.00 for PRCA cowboys.

## THE CURRENT PRCA TAKEOVER ATTEMPT

26.     In early 2005, the PRCA determined that it was in severe financial straights.  In August of that year, the PRCA Board of Directors voted to impose a $200.00 "competition fee" on WPRA members.  Specifically, the PRCA proposed that all WPRA members who wish to have their money won (points) count towards NFR qualifications would be required to pay a "competition fee" (a tax) to the PRCA of $200.00 at the beginning of each rodeo year.  Circuit members who wish to have their circuit "points" count toward Circuit Finals qualification would similarly be required to pay a $200.00 annual fee to the PRCA.  The PRCA Board passed this proposed bylaw without any prior consultation of the WPRA regarding the $200.00 fee.

27.     The WPRA Board of Directors was taken aback.  In 2005, the cost of a WPRA card was $300.00.  On the other hand, the PRCA cards for cowboys cost $500.00.  In light of the PRCA's demanded "competition fee," the WPRA Board believed this increased total cost would ultimately reduce WPRA membership and would threaten its ability to continue as a viable business entity.  Therefore, the WPRA rejected this demand but entered into negotiations with the PRCA to reach an amicable resolution.

28.     In negotiations, the PRCA contended the WPRA owed it more money for the benefits the PRCA provided in terms of national and circuit finals rodeo perks and other benefits allegedly provided by the PRCA.  The WPRA stated that if it owed more, it would pay more, but could not do so without information to justify asking its members to bear an additional cost payable to the PRCA (above the higher PROCOM fees the WPRA members were already paying).

29.     In late 2005, a one-year contract was reached.  In that contract, approved by the Boards of both Associations, the WPRA members agreed to pay an additional $2.00 PROCOM charge for each pro rodeo entered during 2006.  (This would net the PRCA approximately an additional $60,000.00 annually based on past entry statistics.)  In exchange, the PRCA agreed, among other things, to give the WPRA more voice in circuit matters, and issue a press release detailing what benefits each Association provided to the other.  In addition, by the first quarter of 2006, the PRCA promised to provide the WPRA a financial analysis of the costs for programs provided by the PRCA which directly benefit WPRA members (primarily participation at finals rodeos) and an analysis of the benefits the WPRA provides the PRCA (including rights to market the WPRA to obtain sponsorships and the higher PROCOM fees paid by the WPRA members).

The parties agreed to renegotiate a long-term agreement based upon the financial analysis promised by the PRCA.

30.     The PRCA never provided the financial analysis, despite its continuing promises to do so.  However, in early May 2006 the PRCA Board of Directors proposed an onerous $10.00 per entry increase in PROCOM charges for the WPRA for the 2007 rodeo season and an additional $1.00 increase each year for nine years thereafter.  The WPRA Board, after consulting with its members, felt that such charges would severely reduce membership and ultimately threaten the ability of the WPRA to survive.  It would limit the number of women who could afford to continue to compete and slowly put the WPRA out of business.  Instead, the WPRA again requested the PRCA provide the promised financial information, such that the WPRA could quantify what, if anything, was owed and a fair compensation arrangement could be reached.

31.     The WPRA president later met with senior PRCA officials in the early summer of 2006 in an attempt to negotiate this compromise.  However, the WPRA was again stonewalled by the PRCA's refusal to provide the financial analysis and quantify the benefits it supposedly provides the WPRA.  Nor did the PRCA take advantage of the WPRA's offer on July 10, 2006 to appoint three mutually-acceptable directors from its Board of Directors and the PRCA's Board of Directors to work out an agreement.

32.     On August 17, 2006, the WPRA was shocked to receive a letter from the PRCA, stating it was creating a women's professional barrel racing association as a subsidiary to the PRCA.  In effect, the PRCA created this subsidiary to steal WPRA members and put the only independent professional women's rodeo association in America out of business.  The WPRA

immediately requested clarification from the PRCA of the rules for this new subsidiary. The PRCA wrote back that it would respond to the WPRA questions shortly. To date, the PRCA has not responded. In a last-ditch effort to avoid litigation, the WPRA Board sent a letter to the PRCA, proposing a condition of status quo for the 2007 season and the formation of a committee comprised of three Board members of each Association to reach a long-term solution. This suggestion of compromise was also rejected by the PRCA.

## PRCA BARREL RACING SUBSIDIARY

33.    Although not all details regarding the PRCA's barrel racing subsidiary are known, the following is believed regarding the operation of the PRCA subsidiary. First, the PRCA subsidiary would sanction barrel races at the same rodeos around the country that the WPRA has sanctioned, in many cases, for decades. However, rodeo committees have been informed that they cannot have a WPRA-sanctioned barrel race at a PRCA-sanctioned rodeo. Tour rodeos are required by the PRCA to have a barrel race. On information and belief, Tour rodeos have been informed that they must have a PRCA subsidiary barrel race and cannot have a WPRA barrel race. Regular season, non-Tour rodeo committees (which are not required to have a barrel race but usually do) have been informed that if they want a PRCA sanction, the only barrel race they may have is a PRCA-sanctioned barrel race. Second, to ensure WPRA barrel racers join the PRCA subsidiary instead of the WPRA, only points (dollars) won at a rodeo sanctioned by the PRCA subsidiary will be counted towards NFR or Circuit Finals points. Third, costs to barrel racers will go up dramatically. The cost of purchase of a PRCA subsidiary "card" is $200.00 more than the cost to purchase a WPRA card. Insurance costs will also go up. Barrel racing has

a relatively low incidence of injury compared to the men's events.  Because the PRCA says all events will pay equally, the relatively low risk barrel racers will pay higher insurance costs to subsidize the men's events.   Fourth, although there will be a Board of Directors for the PRCA barrel racing puppet subsidiary, the barrel racers will not have representation on the PRCA Board of Directors itself.  Fifth, although both the PRCA and WPRA require new members to win a particular amount of money on a permit before being eligible to buy a card, the PRCA has indicated that present WPRA card members will be allowed to bypass a typical permit-to-card process and simply receive their cards.  Thus, the WPRA card members will be allowed to purchase PRCA subsidiary cards even though PRCA rules generally require new PRCA members to qualify by winning a $1,000.00 on a permit first before obtaining a card.  This demonstrates the PRCA's intent to "raid" WPRA of its members.

34.     As of the date shortly before filing, no subsidiary had yet been formed, although the PRCA has announced its intent to form the subsidiary and its commissioner, Troy Ellerman, has reserved a trade name.   On information and belief, the PRCA will control, direct and encourage the policies of the subsidiary.  The PRCA will choose the subsidiary's initial Board of Directors (unlike the WPRA whose directors are elected by the membership).  In addition, the PRCA's subsidiary Board will have male directors (unlike the WPRA whose Board members are required to be WPRA members and therefore women).

35.     The effect of the PRCA decision will be devastating on the WPRA.  Because of the PRCA's requirement that WPRA barrel races not be held at rodeos sanctioned by the PRCA, it will be very difficult for the WPRA to obtain the sanction of rodeo committees with whom it has cooperatively worked for decades.  Because the WPRA will have drastically fewer rodeos to

13

sanction, its membership will also drop.  The WPRA, the only independent women's rodeo organization in the country, will not be able to exist in its present form.

36.     On information and belief, the PRCA is attempting to take barrel racing "in-house" in order to be able to package all seven rodeo events and sell or license the events or the organization itself for greater profit.

### COUNT ONE:  SHERMAN ACT § 1 RESTRAINT OF TRADE –

### TYING ARRANGEMENT

37.     WPRA hereby incorporates Paragraphs 1 through 36 above.

38.     The relevant geographic market is the United States.

39.     Through 2005, there were five standard events for every rodeo – bull riding, saddle bronco riding, bareback riding, steer wrestling and calf (tie down) roping.  In 2006, the PRCA made team roping a standard event. Now there are six standard events. The relevant tying market is professional rodeo sanctioning for all six standard events.

40.     The PRCA holds a dominant share of the market for professional rodeo sanctioning, including all six standard professional events.

41.     The relevant tied market is professional barrel racing sanctioning.  Barrel racing is a nonstandard event.

42.     The relevant consumers are rodeo committees who select events and pay for Association sanctions in order for that Association's members to compete.  In prior years, the WPRA competed with the PRCA for rodeo committee sanctions for nonstandard events (*i.e.*, team roping). However, now that team roping is a standard event in 2006, barrel racing is the only nonstandard event.

43.     With the creation of the PRCA barrel racing subsidiary, both the PRCA and the WPRA are presently attempting to sell products (barrel racing sanctions) to rodeo committees. Pro Rodeo Tour rodeos are required to have a barrel race.  The PRCA has conditioned the sale of its product (sanction of six standard professional rodeo events) to its professional barrel racing product.  In other words, for Tour rodeos "no PRCA barrel race, no PRCA rodeo."  At non-Tour rodeos, a barrel race is not required.  However, if that rodeo wants a barrel race (and most do), the PRCA has said "if you want a barrel race and PRCA sanction for the six standard events, the barrel race has to be PRCA."  By doing so rodeo committees who desire to have a barrel racing event at their rodeo are forced to accept the PRCA professional barrel racing sanction because there is no real alternative to the PRCA rodeo sanction for the standard events. The tying arrangement will have a substantial adverse effect on competition in the tied market by eliminating competition between professional rodeo associations for the sanction of professional barrel racing.

44.     The PRCA tying arrangement will either lead to an increase in the price charged to the relevant consumer, rodeo committees, and/or a decrease in the quality of the tied product.

45.     As a result of this tying arrangement, a substantial volume of commerce will be affected in the tied product market, *i.e.*, professional barrel racing, in violation of § 1 of the Sherman Act.  This tying arrangement has and will further damage the WPRA.

## COUNT TWO:  SHERMAN ACT § 2 – MONOPOLIZATION

46.     WPRA hereby incorporates Paragraphs 1 through 45 above.

47.     The PRCA possesses a dominant share of the relevant market, *i.e.*, professional rodeo sanctioning.  The relevant geographic market is the United States.  The relevant market is protected by entry barriers, *i.e.*, there is no other major nationwide professional rodeo sanctioning body and creation of such is not economically feasible due to cost of entry into the market.  The PRCA's Wrangler National Finals Rodeo has a long standing tradition as the "Super Bowl" of rodeos.  Because the PRCA controls access to the NFR and has been the predominate professional rodeo event sanctioning body for decades, there are significant barriers to entry for any other rodeo organization to enter the professional rodeo market.  Therefore, the PRCA has monopoly power in the relevant market.

48.     The PRCA willfully attained monopoly power by exclusionary conduct in the following ways:

A.     **Tying.** As described above, the PRCA is tying the sale of its tying product (the standard six professional rodeo events) to the sale of its professional women's barrel race (a nonstandard event).  Because the PRCA has monopoly power in the tying market it is able to use such power to exclude competition in the tied market.

B.     **Refusal to Deal and Control of an Essential Facility**. After several decades of working with the WPRA to create the National Finals Rodeo, the PRCA unilaterally terminated the voluntary course of dealing by refusing to allow WPRA sanctioned barrel races to count towards points for the National Finals Rodeo or for the Circuit Finals, thereby excluding all non-PRCA members from qualifying for or competing in the NFR or

individual circuit finals, including the WPRA members. Such refusal changed a pattern of distribution that had originated in a competitive market and had persisted for many years. The PRCA, through its subsidiary, has elected to forgo short run benefits of receiving higher PROCOM fees from WPRA members (and avoiding the high cost of barrel race administration) in order to reduce competition over the long run by harming its smaller competitor, the WPRA. The National Finals Rodeo is an essential facility in the market of professional rodeos and is controlled by the PRCA. A competitor could not reasonably or practically duplicate the facility because of its long standing tradition in the sport of professional rodeos as the one national final rodeo to determine national champions. All cowboys and cowgirls compete throughout the year to earn a spot in the NFR and compete at the NFR to be the national champion. The PRCA is now denying use of the facility to all non-PRCA members, the reputation of which facility the WPRA barrel racers helped to create. The PRCA can reasonably provide the facility to its competitors because it has done so for at least 40 years. The NFR has had a barrel racing event for many years and the PRCA is contractually obligated to hold such event because of its popularity and ability to generate sponsorship. The PRCA's refusal to deal with the WPRA harms consumers.

49.     The PRCA's actions in announcing a barrel racing subsidiary intended to take over WPRA members and the event of barrel racing demonstrates the willful acquisition or maintenance of the PRCA's monopoly power over the entire professional rodeo sanctioning market in an exclusionary manner.   The exercise of this monopoly power in an exclusionary manner will result in fewer professional women barrel racers and antitrust injury resulting from reduced rodeo fan consumer choice and reduced choice to rodeo committees seeking to hold professional women's barrel races.   The PRCA's acquisition of monopoly power is the result of greed, discrimination and desire for control rather than the result of a superior product or business acumen.

## COUNT THREE:  SHERMAN ACT § 2 – ATTEMPT TO MONOPOLIZE

50.     WPRA hereby incorporates Paragraphs 1 through 49 above.

51.     The relevant market is professional women's barrel race sanctioning. The relevant geographic market is the United States. The PRCA is attempting to monopolize trade and commerce in professional women's barrel racing in the United States, a violation of Sherman Act § 2.

52.     The PRCA has a dangerous probability of succeeding in monopolizing the market because:

      A.     It controls the National Finals Rodeo, an essential facility to professional rodeo competition, and has monopoly power in the market for the six standard professional rodeo events. Such control allows the PRCA to create tying arrangements and refusals to deal, as described above, which

have the effect of excluding competition in both rodeo sanctioning for barrel racing and association membership for barrel racers; and

B.      The market is protected by entry barriers because there are a limited number of professional women barrel racers, the PRCA has been in operation for  years and is well established with all of the major rodeo committees, and because of the PRCA's tying arrangement and refusal to deal, a new entrant into the professional women's barrel racing association market would have to be able to also provide professionals in all of the six standard events as well as a national final competition to compete with the size, reputation, and sponsorship of the NFR.

53.     Pursuant to and in furtherance of this attempt to monopolize, the PRCA has done, among other acts, those described in paragraph 47 above.  The PRCA has taken such action with the specific intent of monopolizing the professional women's barrel racing market and with the effect of attempting to prevent competitors and potential competitors, including the WPRA, from being able to compete effectively for business in such market.

54.     The WPRA has been harmed by the PRCA's anticompetitive conduct.

## COUNT FOUR:  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

55.     WPRA hereby incorporates Paragraphs 1 through 54 above.

56.     The WPRA has had contracts with rodeo committees around the United States for years or, in some cases, decades.

57.     The PRCA had knowledge of these contracts as it contracted with the same rodeo committees and, further, requested the WPRA not to sanction rodeos it did not sanction.

58.     The PRCA, by announcing the formation of and tying PRCA sanctions to its barrel racing subsidiary, has intentionally and improperly interfered with existing contractual relations between the WPRA and rodeo committees, inducing those rodeo committees to breach their contracts with the WPRA.

59.     The WPRA has been injured as a result of the PRCA's tortious conduct.

## COUNT FIVE:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

60.     WPRA hereby incorporates Paragraphs 1 through 59 above.

61.     The PRCA has intentionally and improperly interfered with the WPRA's prospective business relationships with rodeo committees, which relationships span decades in many cases.

62.     This interference has induced or caused such rodeo committees not to enter into or continue relations with the WPRA.

63.     The WPRA has been injured as a result of the PRCA's tortious activity.

## COUNT SIX:  UNFAIR COMPETITION AND/OR MISAPPROPRIATION

64.     WPRA hereby incorporates Paragraphs 1 through 63 above.

65.     The PRCA misappropriated the business value of the WPRA by appropriating the product of the WPRA's expenditure of labor, skill, and money. The WPRA spent years

developing the profession of women's barrel racing, including it's credibility as a rodeo event, popularity, and positive reputation.

66.     The PRCA's creation of a subsidiary barrel racing association in conjunction with its anticompetitive conduct is an improper appropriation of the WPRA's members, business relations with rodeo committees, and business value.

67.     The WPRA has been injured as a result of the PRCA's tortuous activity.

WHEREFORE, the Women's Professional Rodeo Association, Inc. prays:

A.     Defendant Professional Rodeo Cowboys Association, Inc. be enjoined from engaging in anti-competitive conduct described above.

B.     The Women's Professional Rodeo Association, Inc. be awarded judgment against the PRCA for actual damages suffered as a result of the above-referenced conduct, including antitrust violations, and that such sums be trebled as required by law.

C.     The WPRA be granted its costs and reasonable attorneys' fees and interest as provided by law.

D.     The WPRA be awarded such other relief as this Court shall deem just.

**Plaintiff hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.**

Respectfully submitted this 16th day of September 2006.

s/ Dana L. Eismeier
Dana L. Eismeier
BURNS, FIGA & WILL, P.C.
Plaza Tower One, Suite 1000
6400 South Fiddlers Green Circle
Greenwood Village, CO  80111
Phone:          303-796-2626

Fax:            303-796-2777
E-mail:         deismeier@bfw-law.com
**Attorneys for Plaintiff**
**Women's Professional Rodeo Association**


s/ Karin E. Borke
Karin E. Borke
BURNS, FIGA & WILL, P.C.
Plaza Tower One, Suite 1000
6400 South Fiddlers Green Circle
Greenwood Village, CO  80111
Phone:          303-796-2626
Fax:            303-796-2777
E-mail:         kborke@bfw-law.com
**Attorneys for Plaintiff**
**Women's Professional Rodeo Association**

Plaintiff's Address:

Women's Professional Rodeo Association, Inc.
1235 Lake Plaza Drive, Suite 127
Colorado Springs, Colorado  80906